We're ready, if you want to come up. Good morning, Your Honors. Barbara Sloan for the EEOC. Can you hear me? We're the appellant in this action. The district court here erred in dismissing the EEOC's claim challenging MHS's policy of refusing to reassign employees who become too disabled to do their current jobs, even with accommodation. You can still do other work. Consistent with the plain language, the legislative history, the structure of the ADA, and its purpose, as well as the holdings of three appellate courts, including two en banc, and we would say Barnett, the ADA requires this accommodation where all the limitations are met. Because the company doesn't recognize that policy, the policy must be changed. What the ADA says is that absent undue hardship, an employer is required to reasonably accommodate employees who need an accommodation to do the essential functions of the job they have or that they desire. One accommodation that Congress expressly listed in the list of potential accommodations, and by the way, it was not originally in the Rehab Act, is reassignment to a vacant position. That is, if a current employee, due to disability, can no longer do essential functions of his current job, the employer must reassign him to an existing equivalent position that is vacant or soon will be. Of course, there are limitations to that. The individual must be fully qualified for the position. That is, she's able to do all the essential functions of the job that the employer itself has set for the position. The job isn't a promotion, it's vacant, it's existing, no bumping is required, it would not violate a seniority system, and would not cause undue hardship. This is a special rule that Congress created in the ADA because it recognized that individuals with disabilities have a harder time keeping and getting work than people without disabilities. So they said, okay, here, we have an employee here who's doing a good job, but just became too disabled to keep doing the job, let's keep him in the workplace if we can. That way, the employer won't lose a good employee, and the individual will still have work. The en banc, as I said, the en banc, 10th, and DC circuits both agree, and the 7th Circuit does as well, that this is the correct interpretation of the statute. It makes sense because the plain language of the statute is reassign. The core meaning of, the core word there is assign. Assign means appoint. It doesn't just mean, well, let the person get the job if they can do it. It means the employer has to do something. It has to appoint the individual, put the individual in the position. Now, MHS says, well, we accommodate people by letting them compete for jobs along with non-disabled people. In our view, that's not an accommodation at all. Never mind that it's not a reassignment. It's not even an accommodation. It's just allowing people to do what they would already be entitled to do. And as the ACCA court said, if an individual gets a job because he's competed for it and is the best qualified, then if you don't give it to him, he's probably being discriminated against based on his disability. At a minimum, he's not being reassigned. So that's incorrect. That's not sufficient. An individual who competes and gets the job has not been reassigned. The employer also says, well, the statute really just says that reassignment may be a reasonable accommodation. So that implies that it may not be one. That's obviously true. It depends on the circumstances. The list of potential accommodations, the non-exclusive list of potential accommodations are all potential accommodations that may be appropriate in appropriate circumstances, but not in every circumstance. Kennedy. Ms. Sloan, your argument in your briefing has a lot of logic to it. What strikes me is there's been a reluctance in the circuits universally to adjust to Barnett in the way that you say they should. You have the Eleventh Circuit as recently as, oh, I don't know, two years ago not following this path in St. Joseph Hospital. You certainly have this court not even citing Barnett a fair amount of time. I'm not asking you to argue the other side. There's a distinction, at least implicit, that courts are accepting or are reluctant to abandon prior precedent or something. Do you have anything to help me through, whether you can explain why several circuits are not going this direction post-Barnett? It's just the One Circuit. The Eleventh Circuit has gone that way. Well, we've ignored Barnett in some situations where we might have recognized it, I think. But this circuit, I mean. I'm familiar with Medrano, which is completely consistent with Barnett because that's a seniority case. And I'm familiar with Tronca, where the court used Barnett with respect to seniority, which that's what, I mean, Barnett talks about seniority. But then it used Dougherty. And then there's Huber. Huber's out there. But I think the court needs to recall that the Seventh Circuit expressly agreed with the Commission's position that reassignment means reassignment and that Barnett fully supports that position, that Barnett says preferences are sometimes required, if that's what's needed to reasonably accommodate an individual. And there's an exception, a very narrow, that Barnett says reassignment is ordinarily in the run of cases, or what this court, the term this court uses is it's a method of accommodation that's reasonable in the run of cases. It wasn't in that one circumstance because there was a seniority provision and it would conflict with that. But it's a very narrow, the United Airlines court, the Seventh Circuit said it's a very narrow exception because seniority is very unusual. It's unique in the labor management law in the United States. And an individual who's a member of a bargaining unit and he or she knows, I mean, giving jobs to people based on their seniority is predictable, it's objective. You look at who's signed up for the job, you look at what your seniority position is, who's ahead of you. If anybody, if not, you get the job, even if you're not the best qualified, which is interesting. That means a seniority system. Trump said best qualified selection policy. Well, you don't have to pursue that further. I just wondered what your reaction was to why the law is still where it is in some places despite Barnett's age now. But we'll see what we do with this. This doesn't come up that often, Your Honor, frankly. But in St. Joseph's, as we said in our brief, in our view, it's just not very well reasoned. It leaps over the entire first section of Barnett. It doesn't talk about preferences at all. Barnett makes it very clear that preferences are required or may be required in appropriate circumstances, and this is one of them. It may require making an exception to a disability-neutral rule, an exception to that. Is there any way to resolve this case in the way you wish us to resolve it without in some way overruling Doherty? Well, you could look at Doherty as the holding or the dicta that has come out of Doherty. Doherty has come to stand for the proposition that preferences are never required. Foreman reaffirmed that with respect to reassignment. But in neither of those cases was that a holding. In Doherty, the employer, I mean, the plaintiff wanted what would affect being a promotion, which everyone agrees is never required. Foreman is not coming to mind for the moment. If you'll give me a second, I will tell you. Or you can bring it up on rebuttal. Foreman is also, it also wasn't a holding in Foreman. It was just dicta, if you will. And then it's just been carried on, carried on, carried on. So in that regard, you could say, well, Barnett didn't actually. But it did, Your Honor. It really did. I think it's very difficult to reconcile at least the dicta in Doherty with Barnett because Barnett says preferences are required and Doherty says they're not. Barnett says the ADA is not just a nondiscrimination statute. It requires preferences. Doherty says it's a nondiscrimination statute and it just requires equal treatment, which it does not. For example, if an employee needs, can do all the essential functions of a job but can't do any of the marginal functions, the marginal functions get reassigned to another employee. That's, you could call that a preference. Or here, an individual needs a job. Congress made clear that's what was supposed to happen. That's the only way the individual can be accommodated, can be retained, kept in the workplace because the goal of the ADA is to get disabled people working and keep them working. Why don't you address the ruling as to cook? I'm sorry? Why don't you address the ruling as to cook? Okay. This report aired because it granted summary judgment and there are clearly issues of fact here. Because the employer has a no reassignment policy, Ms. Cook would never be qualified in the sense that she could return to her previous job. She never could. Everyone recognizes that. The doctor said she can't. She applied for a job she could do. The company acknowledged that she could do it because it forwarded her application to the hiring official. But nobody bothered to talk to her. This court has very strong case law in the interactive process. I think a jury instructed with that case law could easily find that Ms. Cook was, there was no reasonable, I mean, there was no interactive process here at all. All spring long she's saying, I need a job, I need a job. What can I do? Who do I talk to? What should I do? The company admits it does no ADA training. Well, the facts here are a little bit difficult. She was on FMLA-LEE when she applied for the vacant position. I know you don't think much of the Methodist insistence on medical release, but that at least fits in with where Cook's, what Cook's status was at the time, whether Cook did sufficient follow-up with Methodist, or whether she just ignored some opportunities given to her, are all a part of what we have to evaluate. That's true, Your Honor, but it's a jury question here because, first of all, the floor here is that the company doesn't reassign people. And that was the only reasonable accommodation that Ms. Cook could have. When they wanted to release, they wanted to release to put her back into her patient care technician job, and she can't do that. The doctor said she can't do patient care technician work. They had that information. They had Lincoln Financial saying, here are her limitations. They had her application for a clerical job that was within her limitations that they agreed she was qualified to do. And put that in the context of the fact that in just a month before, she had gone again to her supervisor and said, what can I do? I need to work. And the supervisor said, well, let's call HR. And HR said, there's nothing she can do. She should just resign. So given that she's trying to get work all spring, nobody helps her. Nobody does anything. In June, they tell her, well, you should just resign. In July, she applies for a job. Shortly thereafter, her doctor issues a letter saying she can't do patient care work. Implication, she can do other stuff. It's the first time he's issued a letter that doesn't say she's off work. If you compare the two letters, she wasn't off work. She couldn't do patient care work. We agree with that. And they thought she was qualified for this other job. All right, Counsel. Thank you. Thank you, Your Honor. May it please the Court. Counsel. My name is Simon Whiting, and I'm proud to represent Methodist Hospitals of Dallas. During my 20 minutes, what I'd like to do is to address Ms. Cook's claim briefly, and then I want to spend the bulk of my time talking about the Barnett analysis and the proper interpretation under the ADA. If there are any other questions relating to arguments, the alternative arguments that we've made in our brief, I'll be happy to answer those as well. So, none of the analysis that relates to the Barnett case applies to Ms. Cook. None of it at all. And the reason for that is quite simple. There's no evidence that Ms. Cook was ever released to return to work at any time after mid-April of 2012. Ever. Nothing. The record is very clear on that. There is no knowledge that Methodist had at any time that she had been released to return to work. Yet the EOC wants you to believe that Ms. Cook should have been put into a scheduling coordinator position that she applied for on July 2. Well, it's uncontroverted that one of the essential functions of the job of a scheduling coordinator is to show up for work. You have to be able to show up for work. And she could not. She hadn't been released to return to work on July 2 when she applied for that position. She hadn't been released to return to work when that job was filled on July 31. She was not a qualified individual with a disability under the statute because she couldn't perform the essential functions of that job with or without reasonable accommodation. Now, at that point, we're talking about FMLA leave expiring. So she was out on FMLA leave. She had applied for FMLA leave. Her doctor had certified that she was unable to work all the way through July 15. So July 15 of 2012, her FMLA leave ends. At that point, she continued to remain off work. There was no indication or communication from her that she could return to work. So Methodist sent her a letter on August 7 saying, you know, if you're still unable to return to work, we will offer you an additional accommodation of leave. You can apply for a personal leave, and we will go ahead and extend that to you. This is the six-month unpaid leave? That's correct, Your Honor. So... I'm wondering, depending on what we do on the rest of the case and decide whether or not reasonable accommodation is what the EEOC says it should be, what of the fact that Methodist never suggested that, and we do have this one scheduling job, maybe that's a suggestion, but did not indicate that they would be open to reassigning her? Well, you know, they certainly initiated the conversation on August 7 with a letter, and upon receipt of that letter, she said, well, wait a minute, I can return to work, and then got back with Methodist at that point and said, look, I can return to work, I can't go back to this job, you know, what else can you do with me? Then we could have gone through a different process. So her failure, which may well be sufficient, but you're saying her failure to respond in some way indicating her interest is what keeps the consideration I raised from being relevant. She needed to do more than she did, Cook did. Absolutely. She didn't respond to that letter, and so eventually on the 17th of September, Methodist sent her a letter saying, OK, we haven't heard from you, we're going to go ahead and terminate your employment, and then she appeals it. And I think that the appeal letter that she sends is also instructive because it also doesn't say anything about her being able to return to work at any time. In fact, it says that she's under the care of her physician at that point. So they get this appeal, they then give her additional time until the 22nd of October to go ahead and provide some sort of request or physician certification, which she fails to do. She never responds, so they go ahead and terminate her employment. So we believe that the court below got it right. Insofar as the transfer policy is concerned, this is obviously the major issue in this case, the pattern and practice claim that has been made by the EEOC. And Methodist transfer policy is a disability-neutral policy, and it provides equal opportunity to disabled and non-disabled employees alike. It's designed to provide promotional opportunities that offer professional growth and advancement for employees. The policy specifically says that Methodists will select the most qualified applicant available when they're filling a position. It does also say that when the qualifications are judged equal between an external applicant and an internal applicant, that the internal applicant will get preference. It's a lawful policy. It's in line with the law in the circuit, and the Supreme Court in Barnett. Now, the EEOC wants us to place minimally qualified people into positions for which they are minimally qualified over better candidates in violation of Methodist's most qualified policy. How is most qualified consistent with Barnett? Obviously, the distinction the EEOC wants to make, you understand what that is. And it seems to me most employment policies are versions of most qualified. When I hire a law clerk, I'm following a most qualified policy. Do the best I can and do well, I think, most of the time. All the time. So it seems to me that what Barnett was talking about on seniority and the factors that go into that are very distinguishable from the run-of-the-mill hiring policy which looks for the best candidate. So I'm not saying it's inconsistent with Barnett, but it does seem to me most qualified is not addressed by Barnett and is not comparable to Barnett. Tell me where I'm wrong. There was a question there. I finally added the question. I can't tell Your Honour that Your Honour is wrong, but I think that there, in terms of... You can phrase it better than that. Whereas Barnett, if you look at what the Barnett case is standing for, it says that you have to ask that first question. Is it reasonable in the run of cases? And if so, then you go on to the second step, which is that the burden shifts to the defendant to go ahead and prove under your hardship. But if it is not reasonable in the run of cases to reassign someone to a vacant position because of a disability-neutral policy, like a seniority policy, like Methodist's most qualified policy, then that's the end of the analysis. But the employee can then come back and show some sort of special circumstances as to why an exception should be made. Well, I thought she did that when she applied on July 2nd. She said, I can't do what I used to do, but I can do this secretarial job. Well, when she applied, she was not able to do that. She hadn't been released to return to work under any circumstances. I thought she said, I can do that job. Well, she applied for the job, and when she applied for the job, she said that she wanted more of a part-time position because she wanted to go back to school. So, you know, is this a question of her being able to do the job? I mean, Methodist has to know, because she has been off for all this time, and she is actually on FMLA leave at the time, that she has the ability to show up for work. Remind me, did the hospital ever ask, identify their desire for a release from a doctor? Well, I think that that's just one of those things that you assume. If somebody is out. Okay, it may well be, but there is no direct communication from Methodist saying, Cook, what we need from you is a release from a physician. No, I think that that's fair. That's fine. I just want to make sure about the record. I think that that's fair. Insofar as the statute is concerned, I think it's very important to look at the actual definition of reasonable accommodation, because this is where everything kind of hinges. And the reason that it's important is because it says, reasonable accommodation may include, and then it lists a whole lot of different types of things, one of which is reassignment to a vacant position. The language is may. It's not must. We now have Barnett overlaying, putting some gloss on that, right? Yeah, I think that Barnett is specific as to the question about reassignment to a vacant position, and it gives you an analysis that you need to go ahead and look at when you're faced with one of these types of situations. And I think it's that very first step of Barnett which is dispositive in this case. And the reason it's dispositive is because, similarly to the court in Barnett with the seniority system, this is not reasonable in the run of cases to go ahead and require a Methodist to reassign someone to a vacant position. When is reassignment? I mean, if an employer is going to say, I'm going to hire the most qualified person, there will never be an accommodation. Oh, I don't think that's right. Or reassignment. Well, I think that what the duty is for a company or a hospital like Methodist under those circumstances is to then say to the employee, okay, what can you do? Let's look at the jobs that are available. She says, I can do this job. And, you know, on paper she's certainly minimally qualified. But minimally qualified doesn't mean competent either. It means minimally qualified. Is she qualified or not? Is minimally qualified not qualified? Minimally qualified is... Qualified. It is qualified. Okay. Minimally qualified is qualified. So call her qualified. And under their scenario, she gets that position regardless. When you're a hospital like Methodist and you are required to go ahead and take care of patients and you're dealing with the kind of dollars that they deal with, of course it's also... Either she's qualified to do that or she's not. So that's the question. Well, that's part of the question. The question is whether it's reasonable in the run of cases to go ahead and reassign someone in violation of their disability neutral policy. And that's what we're saying. It's not reasonable to require them to do that because it affects the operations of the hospital. It affects the efficiency of the hospital. Well, it seems to me that's only true if she's not qualified. No, I don't think so. If you're saying a person like her is not qualified enough, then you need to explain what qualified means better than you've done. To me, it's a word game here. If you're putting somebody in jeopardy, if you put her in the position, then she's not qualified. So it's either she's qualified or she's not. Right. Well, let's look at the scheduling coordinator position, which is responsible for 14 different operating rooms and for three other GI labs. And that person is responsible for liaising between all of the various components, the physicians, the physiologists. And the question is, I get it. I get malpractice. I get all of that. Either she's qualified to do that job or she's not. If she's not qualified, then we have nothing to talk about. But if she is qualified, that she is capable of competently, professionally doing all the things that job requires, then she's qualified. It's either she is or she isn't. I agree. There's no gray area here. So if she's qualified, she should be accommodated if Barnett means what it says. Well, that's perhaps where the distinction is different because we think that that first step of Barnett... Well, if we disagree with you, then what? Well, insofar as Doherty is concerned, I think that Doherty fits into that first component because it doesn't require affirmative action. It doesn't mandate that we put that person into that position. What if we disagree with you? Where does that leave Cook? Well, if the court disagrees, what that means is from a policy standpoint that the policy itself on its face is unlawful under the ADA, and it means that the burden shifts to Methodists to prove undue hardship. And so if you're looking at what this is, which is a global attack on a particular policy, then that undue hardship piece is obviously very difficult to apply on a global level. But I think that we've made an effort in our brief under those circumstances, and I think that we've argued because of the special circumstances that apply to a hospital, which I don't think are very different from those in the St. Joseph's Hospital case. I think that they articulated them well there. Another case that was not cited in the briefs, and we filed a letter brief this morning, briefly under 28J referring the court to it, is the Woody case out of the Fourth Circuit, which addresses each and every one of the arguments made by the EEOC in this case and supports the position here. We'll have to look at it. I didn't note that this morning. But does it address Barnett and say Barnett does not require a preference? It does. And in terms of the preferences, if the court will permit me to address that particular piece, what Barnett does talk about is preferences, but it gives examples of the kind of preferences that it's talking about. And the preferences that it talks about are disability-neutral rules, like, for example, a furniture budget. So you get a certain type of chair under our budget, but if you are a disabled person who needs a special kind of chair, well, they get a preference. That's the sort of thing that they address. They also address the issue of scheduled breaks. Everybody gets a break at a certain time of the day. Well, somebody may need to take their medications at other times or have some other reason for that break. The court recognizes that too. Counsel, you're kind of... And I may be overreacting to what you're saying just now, but it seems to be Barnett is a whole lot more than special chairs for disabled. Obviously, it comes up with this two-step process that you've talked about a fair amount, about whether a particular hire has to be made or not. It talks about how not requiring the ADA, not requiring the employer to grant a request that would violate a disability-neutral rule would provide a preference. I mean, the argument it's responding to is it does not require a preference. While linguistically logical, this argument fails to recognize that the Act specifically requires preferences. I mean, much longer discussion than I just gave it. And then it gets into the specifics of hiring. My concern, I'm not trying to be a devil's advocate here, but just my concern that I want to address, it seems to me Barnett is quite likely inconsistent with Doherty. It does require preferences. It does say, it seems to me, that in something like a seniority system, which is not all that common, it seems to be the case, that that has a very strong weight that would affect the opportunity for a preference. But hiring the best person, as the hiring committee decides, is the best person. It's the normal way to hire. So the mine run of cases, if you don't allow a preference to a vacant position and all the rest that has to go into it for somebody who is qualified, you had that discussion with Judge Owen, it seems to me is to wipe out Barnett having any effect at all other than maybe chairs for the disabled. Well, I think that what the Court needs to do is to have a look at the very next sentence in Barnett. And that's where it emphasizes that the preferences are necessary to create sameness of opportunity. That's what the preferences that the Court's referring to there relate to. Of course, that's the sentence that got left out of their brief. We all emphasize and brace what seems to help. But go ahead, go ahead. And so the idea is to be able to create a situation where that disabled person gets equal opportunity. That's what it says. And that's the very next sentence of what it says. And then if you look at the opinion, those examples then follow from those particular statements in the Barnett opinion. So I think that that's what helps straighten that piece out on the preferences. I think the affirmative action piece here is really important because, you know, under our law in Doherty and also under, you know, the Taronga case mentions it in a footnote, the Foreman case mentions it and others, but there are six other circuits that follow the same rule that it does not require affirmative action in reassigning individuals. So we've got the Second Circuit, we've got the Fourth Circuit, we've got the Sixth Circuit, we've got the Eighth Circuit and the Eleventh Circuit all having that same belief that we have. How many of the six have restated that after Barnett? After Barnett, most of the cases that have addressed this particular issue since Barnett have held that it's not reasonable in the run of cases to require someone to be reassigned to a vacant position in violation of a best qualified applicant policy. Most of the cases. And certainly, you know, in terms of the actual split in the circuits, we have the Seventh Circuit is the only case outside of, since Barnett, that deals with that particular issue on the one side which favours the EEOC, and you've got the Eighth Circuit and the Eleventh Circuit favouring our side on this particular question. Is the Eighth Circuit the one you sent us this morning? No, the Eighth Circuit case is Huber. It is in the briefing. So which circuit is the one you gave us this morning? That comes out of the Fourth Circuit. It's actually an Eastern District of Virginia opinion in the Fourth Circuit, the United States versus Woody. The United States filed an appeal, they appealed it to the Fourth Circuit, and then for some reason they decided to go ahead and dismiss their appeal. Don't know why. But the reason that I bring that to the Court's attention is simply because if you have a look at each of the issues that are addressed in our briefing and also in the EEOC's briefing, they are addressed perfectly all the way through, and we believe come to the right decision on that too. So, I see I'm almost out of time over here. Insofar as... I want to quote something from Woody. So if you get the idea here, if the preference arises just from the mere status of being a disabled employee, as the EEOC would happily believe, then a 25-year-old male, white male, disabled employee who's worked at Methodist for six months would automatically get a position over a 65-year-old African-American female who's not disabled and who's more qualified for the position and who didn't have a disability and who worked at Methodist for 40 years. And as the Woody Court says, it strains plausibility in the norms of statutory interpretation beyond recognition to conclude that Congress has made that far-reaching decision and, moreover, that it has done so in the definitional section of a statutory provision describing what reasonable accommodations may include. May doesn't mean must, and reasonable doesn't mean necessary, but that's what the EEOC would happily believe. I think my time is up. Thank you. Thank you. I was going to say a couple of things about the charging party and then I'll talk about the reassignment policy. I want to reiterate that this Court has very good, strong case law on interactive process, and there's no interactive process here at all. The employer has a duty to initiate discussions, bilateral discussions, aimed at trying to accommodate. MHS suggested that that's what... They agree that's what should happen, but it's not what happened here. No one ever asked Ms. Cook what she wanted to do. They said, in fact, they had that little powwow right before the letter went out, and they said, geez, we don't know what she could do, so I guess we should just put her on leave. She didn't need leave. She wants a job. So, you know, that's important that they even agree. They should have talked to her. They should have talked to her. Why didn't they talk to her? Why didn't they ask for a release if she needed a release? Turning to Barnett and the transfer policy, Barnett says that reassignment, presumptively, is a reasonable accommodation. It's reasonable in the front of cases. So if you take out seniority... which is a narrow little piece... and then you take out best qualified selection policies, which is virtually every employer, what's left? Why did Congress go to the trouble of putting in this section of the statute, which, as I said, wasn't in the Rehab Act, if it wasn't going to apply at all? So, next. Yeah. They say they should have talked to her, but they didn't. We don't think their policy is unlawful. The policy of best qualified selection policy isn't unlawful. They're perfectly able. We would completely agree. They can keep the policy. They just have to make an exception to it if somebody needs reassignment as a reasonable accommodation. Nothing wrong with the policy. The only thing wrong with it is their refusal to make an exception. The sameness of opportunity, that's a term I think they use. I'm not sure it's in Barnett. But equal employment opportunity is a term. That is what the ADA is designed to do. But that's what happens here if we have two employees, one disabled, one not disabled. One is going to lose his job because of a disability. The other one is going to keep on working. To make equal employment opportunity, one way to do that is to get a job for or make sure that the individual who is currently employed is doing a good job, but because of disability is going to lose his job, can remain in the workplace being a productive employee. And just as an aside, an individual who is reassigned leaves a vacancy. So maybe the individual who doesn't get the job because of the employee who's been reassigned might even prefer that job. It's a vacancy that can be then filled by someone else. It's not a zero-sum game here. And as far as the sameness of opportunity, you just have to give the employee only an accommodation if it will level the playing field, that was the argument that the employer made in Barnett. And Justice Scalia discussed it in his dissent. And he said, that's what I would hold, but the majority didn't agree with me. So unfortunately, that didn't prevail. That's all I have, Your Honor. I'd like to ask that you please reverse. Thank you, counsel.